UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES – GENERAL

| | | |
|---|---|---|
| Case No. | 2:25-cr-503-BFM | Date: 1/8/2026 |

Present: The Honorable: **Brianna Fuller Mircheff, U.S. Magistrate Judge**

Interpreter

| C. Howard | | John Paul Lecedre |
|---|---|---|
| *Deputy Clerk* | *Court Reporter / Recorder* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s) | Present | Cust | Bond | Attorneys for Defendants: | Present | App |
|---|---|---|---|---|---|---|
| Russell Gomez Dzul | N/A | | | DFPD James Threatt<br>DFPD Hannah Bogen | N/A | X |

**Proceedings: (In Chambers) Order on Motions in Limine (ECF 68, 72, 74)**

Pending before the Court are three motions in limine. As explained below, the Motions are granted in part and denied in part.

**A.    Factual and Procedural Background**

The two disputed motions relate to a sequence of events that occurred before the alleged assault conduct, and thus the Court briefly recites the facts taken from the government's witnesses' reports and the video presented in connection with an earlier Motion to Suppress, as described in the Court's Order on that Motion:

> On June 7, 2025, around 12:55 p.m., at least three Border Patrol Agents were patrolling an area in Los Angeles County, California. They saw an individual run away from their vehicle, and at least one of the agents got out of the car and chased the individual. (Opp'n Ex. 1 at 3.) The bodycam footage reflects the agent chasing the individual through multiple parking lots. (*See* Mot. Ex. A at 0:50-1:44.) He then lost sight of him, but saw another individual, later identified as Gomez Dzul, ride his bicycle through the same parking lot. An agent claimed Gomez Dzul "looked toward the agents" and then "fled" in the other direction. (Opp'n

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Ex. 1 at 3; Opp'n Ex. 2 at 3.) Agents chased him on foot to a house and found him hiding between a car and a wall. [FN: An agent grabbed his arm and pulled him from his hiding spot, put him to the ground, and handcuffed him. One Report of Investigation reflects the agent's claim that Gomez Dzul "physically resisted by pulling away his arms to keep them in front." (Opp'n Ex. 1 at 4.) Another states that Gomez Dzul "physically resisted by forcefully pulling away from [his] grip." (Opp'n Ex. 2 at 3.) . . . ] From there, they put Gomez Dzul into the back seat of the Border Patrol vehicle and drove off. As they did, they continued to discuss the individual they had been trying to find initially.

Bodycam footage reflects that the agents and Gomez Dzul drove some distance; the record does not reveal exactly how far but more than two minutes elapsed on the bodycam footage. (Mot. Ex. A at 3:55-6:16.) Gomez Dzul and an agent were together in the back seat of the car. As they drove, the agent asked Gomez Dzul why he ran ("I thought it was the marathon of Los Angeles") and what his immigration status was ("I came with a visa. And my wife has already adjusted me."). (Mot. Ex. D at 3.) The agents then returned to discussing some other individual who had evaded officers. (Mot. Ex. A at 6:00-6:10.) Agents stopped the car and looked at another residence. The bodycam footage provided to the Court ends there, with several agents and two to three Border Patrol cars looking for some individual and with Gomez Dzul in the backseat of the car. (Mot. Ex. A at 6:10-8:00.)

According to the Report of Investigation, "[s]hortly after"—again, the record does not reveal how long—a group of protesters gathered around two agents who were on foot. (Opp'n Ex. 1 at 4.) The car in which Gomez Dzul was riding circled back to pick up the two agents. (Opp'n Ex. 1 at 4.) An agent opened the door next to Gomez Dzul to permit the agents who were on foot to enter the car quickly. (Opp'n Ex. 1 at 4.)

According to the agents, at that point Gomez Dzul attempted to flee, "pushing forward toward the open door and thrusting his body

forward in an active attempt to escape custody amid the chaotic environment." (Opp'n Ex. 2 at 4.) In the chaos, an agent pulled out pepper spray, and, at the same time, began trying to push Gomez Dzul back into his seat and re-secure him. (Opp'n Ex. 2 at 4.) The agent claims an "accidental, minor discharge of OC spray occurred" to Gomez Dzul's right cheek area. (Opp'n Ex. 2 at 4.) The agent claimed that, despite the pepper spray, Gomez Dzul continued to "resist arrest and detention" but another agent quickly assisted to get Gomez Dzul back into the car. (Opp'n Ex. 2 at 4.) Agents claim that, during this interaction, Gomez Dzul assaulted an agent.

(ECF 65 at 2-3.)

The Court previously concluded that the initial stop was unlawful, but that any assault would break the causal chain and did not preclude prosecution on this assault charge. (ECF 65 at 5-7.)

In the leadup to trial, the government filed three motions in limine. (ECF 68, 72, 74.) One of them, concerning the admissibility of Defendant Gomez Dzul's post-arrest statements, is not opposed. (ECF 74, 78.) In the two opposed motions, the government asks the Court to preclude—and the defense, to permit—testimony and evidence surrounding the circumstances of the initial stop and arrest, and the fact that the Court previously found it to be unlawful. (ECF 68, 72.) Related to these Motions, the defense proposed a jury instruction that would inform the jury that the Court found the initial detention not to have been supported by reasonable suspicion. (ECF 88.)

**B.    Analysis**

With respect to the two disputed motions in limine, the defense offers several theories of relevance. Specifically, the Court understands the defense to argue the following theories: (1) that excluding evidence of the initial arrest might lead the jury to believe that Gomez Dzul was handcuffed because he had committed a criminal offense; (2) that the circumstances of the offense are relevant to Gomez Dzul's

"intent'" (3) that the circumstances of the offense and its illegality are relevant to whether the alleged victim was performing official duties at the time of the assault; (4) that language captured on the video went to agent witnesses' credibility and/or bias against undocumented immigrants; and (5) that the agents' conduct during arrest is relevant to whether Gomez Dzul acted in self-defense. The defense argued that preclusion of the evidence would be both error under the rules of evidence, and constitutional error, in that it would deprive him of the right to present a defense. The Court reviews each of these theories.

First, the nature of the agents' duties is relevant to the official duty element of the offense, and thus questions reasonably related to that element—including that the agents were performing *civil* immigration enforcement when they made contact with Gomez Dzul—are not beyond the bound of relevance and thus may be adduced at trial. The inference the jury would likely draw, then, is not that Gomez Dzul was arrested for a criminal offense, but for violations of immigration law. Moreover, the Court offered to consider an appropriate curative instruction, should the defense request one, telling the jury not to speculate about the reason that Gomez Dzul was detained by the agents. The fact that the jury might not comply with that instruction is not reason to admit otherwise inadmissible evidence.

Second, the defense argues that evidence concerning the arrest and its illegality is relevant to Gomez Dzul's intent. Assault is a general intent crime, which means that the only intent required for the offense itself is that the act constituting assault was intentional and volitional. Gomez Dzul's "state of mind is not otherwise relevant" to the elements of assault. *United States v. Lamott*, 831 F.3d 1153, 1156 (9th Cir. 2016). The Court does not see, nor did the defense provide a clear explanation, of how any evidence relating to the circumstances of the arrest is relevant to whether Gomez Dzul intentionally struck the agent.

Third, the defense argues that evidence relating to the initial contact and arrest and its legality is relevant to whether the alleged victim was engaged in official duties when the assault occurred. In *United States v. Span*, the Ninth Circuit made clear that an individual has no right to resist by force an arrest that is not supported by probable cause. 970 F.2d 573, 580 (9th Cir. 1992) ("*Span I*"); *see also*

*United States v. Span*, 75 F.3d 1383, 1388 (9th Cir. 1996) ("*Span II*"). That holding would make no sense if the absence of probable cause simply meant that acquittal was required under the different (but as the *Span* cases recognize, closely related) official-duties element. Since *Span*, moreover, the Ninth Circuit has sanctioned an instruction that "the test" for determining whether an officer was engaged in the performance of official duties did not turn on "whether the officer [was] abiding by laws and regulations in effect at the time of the incident." *United States v. Ornelas*, 906 F.3d 1138, 1149 (9th Cir. 2018). The only exception acknowledged by the Ninth Circuit to that rule is the use of excessive force. *Span II*, 75 F.3d at 1389. Taking all these cases together, the Court concludes that this Court's finding that the detention was not supported by reasonable suspicion does not mean that the agents were not performing official duties when transporting Gomez Dzul for investigation or prosecution of civil immigration violations. The Court's finding is thus not relevant to that element.

For the same reason, the defense's proposed supplemental instruction (ECF 88) concerning the Court's prior ruling regarding the illegality of the arrest is not appropriate, because the legality of the arrest that led Gomez Dzul to be in the car at the moment of the alleged assault is not relevant to any element of the offense.

At the pretrial conference, defense counsel pointed to statements the agents made while in the car, after they handcuffed Gomez Dzul and before the alleged assault, and whether they have any bearing on the official duties element. The Court re-reviewed the bodycam video submitted in connection with the motion to suppress. (*See* ECF 45 (Ex. A ("A0_mic_track")).) It reflects some discussion of the individual who had initially escaped capture and other individuals who may have run from the sight of Customs and Border Protection agents. As the defense represented, there is some discussion of pursuing their targets by jumping the fence onto private property and acknowledging that the bodycam was on. There are other parts of the video where the Court cannot hear the audio enough to understand what the agents are saying. From what the Court can hear, however, there is nothing that would suggest the agents were pursuing some purely personal "frolic" during these few minutes between the arrest and the alleged assault. Even if there were such evidence, it would not shed light on whether the alleged victim was engaged in the performance of

official duties at the time of the alleged assault. The Court thus declines to find that the time when officers were looking for other individuals between their detention of Gomez Dzul and the alleged assault is relevant.

Related to that discussion, the defense argued at the pretrial conference that comments made during that portion of the bodycam footage bear on the agents' credibility and bias against undocumented immigrants. Again, the Court reviewed the bodycam video that was submitted in connection with the motion to suppress and does not understand what comment(s) the defense was referencing. The defense's briefing mentions credibility and bias but does not point to a specific statement either. (*See* ECF 76 at 5.) If the defense wants to draw the Court's attention to a particular statement that it believes bears on the credibility or bias of a trial witness, the Court will revisit that argument.

In its brief, the defense makes a slightly different bias argument: that the agents might be biased to exaggerate Gomez Dzul's conduct to avoid professional discipline for their unlawful conduct in arresting him for immigration violations without reasonable suspicion. The Court has been presented with no basis to believe that Customs and Border Protection agents face discipline for arresting a noncitizen without reasonable suspicion, and the discussion on the bodycam video (including discussing yet other target(s) who may have run upon seeing the agents) does not suggest that the agents themselves had any concerns along those lines.

Finally, the defense argues that any rough contact between the officers and Gomez Dzul during that arrest is relevant to whether any assault that occurred was an act undertaken in reasonable self-defense. As a general matter, evidence concerning the prior interaction between the agents and Gomez Dzul is irrelevant: the self-defense instruction requires jurors to find that the defendant reasonably believed that the use of force was necessary to defend against the *immediate* use of unlawful force—not as retribution for some prior (alleged) use of force.

A prior act of force by agents against Gomez Dzul could bear on the reasonableness of Gomez Dzul's perception that force was required or the reasonableness of the amount of force used, which is an element of self-defense.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

*United States v. Garcia*, 729 F.3d 1171, 1178 (9th Cir. 2013), *as amended* (Aug. 13, 2013) (a defendant may testify about prior violent acts that the defendant was aware of, as relevant to reasonableness of decision to use force); *see also United States v. Bryan*, No. 3:19-cr-00060-MMD-WGC-1, 2021 WL 2301924, at *2 (D. Nev. June 4, 2021) (*Garcia* is not limited to cases where a *defendant* takes the stand, but also applies where evidence from other sources establishes facts that a defendant necessarily was aware of). If the defense wishes to cross-examine the agents about whether they used force in taking Gomez Dzul into custody, or introduce the bodycam video of agents pulling Gomez Dzul from behind the car, handcuffing him, and putting him into the car to show the forced used, they may do so—assuming foundation and other prerequisites are met.[1] At that point, it would seem the government would also be free to elicit information concerning the interaction to explain any perceived use of force—i.e., the report's claim that Gomez Dzul resisted their attempts to handcuff him. (*E.g.*, ECF 50-1 at 4.)

The parties may, also, wish to propose a limiting instruction, as the evidence is not otherwise relevant. Because the parties did not discuss either the "opening of the door" effect of admitting this portion of the evidence as relevant to self-defense, nor whether any instruction would be appropriate, the Court will entertain argument on those points before the start of evidence. What should be clear—and what the government's witnesses should understand—is that unless and until the defense introduces evidence as relevant to self-defense, evidence concerning the arrest is not only irrelevant, but probably also not admissible by the government as a fruit of an illegal detention, and thus may not be introduced by the government or disclosed by its witnesses until the defense opens the door to such evidence.

---

[1] Using the bodycam video (A0_mic_track) submitted in connection with the Motion to Suppress, the Court is talking about roughly 2:25-3:25, though the exact timestamps can be a matter of further discussion, if the defense intends to proceed down this road.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

## C.  Conclusion

Based on the above, the Court grants in part and denies in part the motions in limine (ECF 68, 72). Neither party shall discuss the circumstances of Gomez Dzul's arrest, nor the Court's prior finding that the arrest was not lawful, with the narrow exception just described, absent further order of the Court. The government shall not use the evidence concerning the circumstances of arrest as relevant to self-defense unless and until it confirms with the Court that the Court has found the triggering circumstances met. This order does not preclude either party from presenting evidence relating to the nature of the duties that led the agents to be out in the field, as such evidence is relevant to the official-duties element.

The defense did not object to the portion of the government's motion that sought exclusion of general arguments concerning immigration law or enforcement policy. The Court thus grants the motion in that respect.

Finally, the defense indicated it did not object to the government's motion to preclude testimony or evidence concerning Gomez Dzul's post arrest statement (ECF 74). The Motion is thus granted in full.

As this order is issued in limine, counsel may revisit any subject described herein if evidence adduced at trial provides a basis to do so. Barring further order of the Court, however, the parties and their witnesses shall adhere to this Order. Both parties shall instruct their witnesses concerning the contents of this Order and shall instruct their witnesses that if a question is posed that would call for a response arguably covered by this Order, the witness should respond "sidebar." If an attorney believes a question posed by opposing counsel is likely to elicit a response that will violate this Order, they, too, may request a sidebar.

**Initials of Deputy Clerk**  CH